IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| ERICA MILLER, for the use and benefit of herself or, alternatively, KINISON MILLER, her minor child, | ) ) ) ) ) ) ) ) | No. 2:23-cv-00104-KAC-CRW |
| PLAINTIFFS, | ) ) | AMENDED COMPLAINT FOR RECOVERY OF GAMBLING AND |
| v. | ) ) ) ) ) ) ) ) ) ) | ILLEGAL LOTTERY LOSSES PURSUANT TO TENN. CODE ANN. § 29-19-105 AND FOR PUNITIVE DAMAGES |
| FANDUEL, INC., a foreign corporation | ) ) ) | JURY TRIAL DEMANDED |
| DEFENDANT. | ) ) | |

Plaintiff Erica Miller, for the use and benefit of herself, or, alternatively, Kinison Miller, her minor child and child of her former spouse, Kenneth Miller, brings this action against Defendant FanDuel, Inc. to recover gambling and lottery losses and would allege as follows:

## I.

## NATURE OF THE ACTION

1.     This is individual action brought by the Plaintiff Erica Miller, for the use and benefit of herself or, alternatively, Kinison Miller, her minor child and child of her former spouse, Kenneth Miller, pursuant to TENN. CODE ANN. § 29-19-105, for the Recovery of

Gambling and Wagering Losses and Lottery Losses incurred by her spouse in order to remedy Defendant's wholesale promotion and operation of then-illegal gambling, wagering and lotteries in Tennessee in violation of express Tennessee statutory law and Tennessee's Constitution.

## II.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action by virtue of TENN. CODE ANN. § 16-10-101 *et seq.*

3.      This Court has personal jurisdiction over Defendant FanDuel, Inc., pursuant to TENN. CODE ANN. §§ 20-2-214(1) and (2) and 20-2-223(1), (3) and/or (4) on the grounds that the claims asserted against it arise from its transaction of business within Tennessee and on the grounds that it has committed tortious acts within Tennessee. Furthermore, Defendant FanDuel, Inc.'s contacts and actions directed toward Tennessee warrant the exercise of personal jurisdiction pursuant to TENN. CODE ANN. § 20-2-225(2).

4.      Venue is proper in this judicial district pursuant to TENN. CODE ANN. § 20-4-101(a) on the grounds that the cause of action arose in Shelby County, Tennessee. Venue is also proper in this judicial district pursuant TENN. CODE ANN. § 16-11-115(3) and (4) on the grounds that this county is the location where the services and/or activities were rendered.

5.      Plaintiff initially filed this case on April 26, 2016 in the Chancery Court for the Third Judicial District at Greeneville. Defendant removed the case to this Court on April 29, 2016.

6.      This case was thereafter transferred to *In re: Daily Fantasy Sports Litigation*, Case 1:16-md-02677-GAO, MDL No. 2677, where it has languished and nothing of substance has occurred.

2

7.     In 2022, Defendant entered into a settlement agreement in connection with the MDL. The settlement did not release any of Plaintiff's claims or causes of action in this case.

8.     In 2022, the United States District Court for the District of Massachusetts concluded pretrial proceedings in MDL No. 2677 and closed the MDL. To date, to the knowledge of Plaintiff, the United States District Court for the District of Massachusetts has not remanded this action back to this Court.

9.     Out of an abundance of caution, and to preserve all of her rights, claims, and causes of action in this case, Plaintiff hereby refiles her Complaint.

## III.

## THE PARTIES

10.     Plaintiff Erica Miller (hereinafter referred to as "Plaintiff") is an individual resident of Greene County, Tennessee. Plaintiff is the mother of Kinison Miller, her minor child, and she is the former spouse of Kenneth Miller, Kinison Miller's father, a Tennessee resident of Greene County, Tennessee who engaged in then-illegal gambling and unlawful lottery contests promoted and operated by Defendant FanDuel, Inc. Ms. Miller was married to Kenneth Miller at all times relevant to the allegations underlying the claims set forth herein.

11.     Defendant FanDuel, Inc. (hereinafter referred to as "FanDuel") is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business located at 300 Park Avenue South, 14th Floor, New York, New York 10010. Service of process can be obtained on FanDuel through Christian Genetski (FanDuel's Chief Legal Officer) or any of other its officers located at 300 Park Avenue South, 14th Floor, New York, New York 10010.

3

**IV.**

**FACTUAL ALLEGATIONS**

A.      **Summary of  Allegations**

12.      Defendant FanDuel operates a website known as "FanDuel.com," which offers to Tennessee residents daily and weekly fantasy sports gambling contests for cash prizes in major professional sports, such as the National Football League, the National Basketball Association, the National Hockey League and Major League Basketball as well as in college football and basketball. Specifically, acting like any Las Vegas sports "bookie," FanDuel provides a forum where Tennessee customers can make propositional wagers on the outcomes of the actual performance of specific athletes and sports teams on a daily basis, charging a commission or "rake" on all wagers made and, at times, risking its own money in these wagers.

13.      Because FanDuel's customers are betting on the outcome of athletic feats achieved by sports teams and players over which they have no control, FanDuel's activities constituted the then-unlawful operation of gambling activities and lotteries within the State of Tennessee prior to July 2016, when the Fantasy Sports Act of 2016 became effective.  The Fantasy Sports Act of 2016 does not apply retroactively.  Regardless of the alleged amount of "skill" that FanDuel attributes to the gaming that it promotes, Tennessee law expressly defines "gambling" to mean "risking anything of value for a profit whose return is to any degree contingent on chance, or any games of chance associated with casinos, including, but not limited to, slot machines, roulette wheels and the like." *See*, Tenn. Code Ann. § 39-17-501(1)(emphasis added).  As a result, FanDuel has clearly engaged in gambling in Tennessee prior to July 2016, which was expressly prohibited under Tennessee law at that time.

14.      Further, by charging fees for a chance to win the gaming contests promoted by it (and at times risking its own assets to cover such contests), FanDuel operated an illegal lottery in

Tennessee at all times relevant to this Amended Complaint. Under Tennessee law, a "lottery" means "the selling of anything of value for chances on a prize or stake." TENN. CODE ANN. § 39-17-501(5). Again, then, regardless of the alleged degree of skill that it attributes to the gaming contest created and promoted by FanDuel, prior to July 2016, FanDuel engaged in the operation of an illegal lottery in Tennessee (which was expressly prohibited by Tennessee law and Article XI, Section 5 of Tennessee's Constitution) because chance is clearly an element affecting the outcome in these contests.

**B.** **The Gaming Contests Created, Promoted and Operated by FanDuel Clearly Involved the Risk of Monetary Sums for a Profit Whose Return is to "Any Degree Contingent Upon Chance."**

15. FanDuel has created an on-line betting website by devising a game that awards points based upon the performance of various professional and college athletes and teams in specific games on specific days. FanDuel charges an entry fee and then accepts wagers from bettors for these sporting event contests, from which it deducts a commission or "rake" in an amount of approximately 9%.

16. With respect to each sporting event contest, FanDuel determines in advance of each contest which athletes and sport teams its betting customers can select to bet on and assigns a "handicap" (i.e., similar to a betting point spread) based upon the perceived potential of these actual athletes and teams to score the points. The charging of entries fees and a commission on the dollars wagered by its bettors is the primary basis of FanDuel's revenues; thus, the revenues to FanDuel largely depend upon the price of the entry fee for each contest as well as the total dollars wagered by the bettors in each contest.

17. However, FanDuel also frequently guarantees a certain amount will be paid in prize pool winnings for a given sporting contest and, when necessary, covers the difference for the bettors between the guaranteed prize amount and the sum total of entry fees and/or total

5

amounts wagered. The difference between the entry fees and amounts wagered and the guaranteed prize money is known as the "overlay." In situations where an overlay is needed from FanDuel, FanDuel risks its own assets in the gambling ventures it promotes and, thus, has a significant incentive to attract as many bettors as possible in order avoid paying out its own money to cover the overlay.

18.     Once bettors on FanDuel's website have wagered their sums by selecting a given athlete or team, the bettor has no ability to control the outcome of the betting contest. Specifically, FanDuel's bettors have no ability to control how many points their selected athlete or teams will receive from the actual athlete's or team's performance. Instead, only the actual athlete players and teams in the underlying sporting events control their own performances, and even then, these actual athlete and teams are subject to a number of chance variables, such as "bad" officiating, illegal contact, sickness, injury, weather conditions, and any number of other variables well beyond the actual athlete or sporting team's own control.

19.     As a result, after FanDuel bettors place their bet by setting their final lineups, they have no ability to influence the outcome of the actual sporting event game. At that point, the bettors wait to see what happens based upon the performance of the actual players and teams selected.

20.     FanDuel erroneously claims that the dominant factor for successful betting through its website is the level or amount of "skill" employed by its customers in best predicting which athletes and teams will score the most points. FanDuel, however, eliminates almost the entire element of skill by establishing a handicap (similar to a point spread) for the limited number of athletes it determines can be used for a particular wagering event. By establishing a "spread" for each athlete and limiting the number of athletes the bettors can use, bettors are engaging in a gambling scheme predominately based upon chance.

6

21.     Regardless of whether the gaming scheme concocted by FanDuel is characterized as predominately one of "skill" or "chance," however, it is well established under Tennessee law at the times relevant to this Amended Complaint and prior to July 2016 that FanDuel was engaged in the promotion and operation of a gambling enterprise because its activities easily encompass "risking anything of value for a profit whose return is <u>to any degree contingent on chance</u>..." as defined TENN. CODE ANN. § 39-17-501(1).  Thus, unlike other states' laws that define gambling to be only those activities in which chance predominates, no such analysis is applicable under Tennessee law -- where any degree of chance is involved, gambling is established.

22.     Tennessee Attorney Generals have consistently ruled that any gaming device like that concocted by FanDuel is "gambling" when <u>any degree</u> of chance is present in the game. *See*, Op. Tenn. Att'y. Gen. No. 05-159 (Legality of Texas Hold' Em Poker Tournaments with Jackpot Price, Oct. 14, 2005)(ruling that poker tournaments charging an admission fee to play "Texas Hold' Em" for a chance to win a prize constituted "gambling"  as defined under TENN. CODE ANN. § 39-17-501(1) regardless of the skill involved and was unlawful); Op. Tenn. Att'y. Gen. No. 06-046 (Legality of Leasing  Equipment for and Conducting Poker Tournaments, Mar. 10, 2006)(ruling that leasing equipment for and conducting poker tournaments that charge an admission fee  to play "Texas Hold' Em" while being designated  "for entertainment  purposes only" constitutes "gambling" in Tennessee and is unlawful); Op. Tenn. Att'y. Gen. Opinion No. 99-084 (Legality of Fishing Tournament Wherein Entrants Pay Fees With an Opportunity to Receive Cash and Other Prizes, Apr. 5, 1999)(holding that fishing tournament  in which participants must pay entry fees for the possibility to receive cash and other prizes for catching specifically designated fish was "gambling" despite skill involved because it involve a degree of

chance).

23.     On April 5, 2016, Tennessee's Attorney General issued his opinion styled

"Legality of Fantasy Sports in Tennessee, Op. No. 16-13 (hereinafter referred to as the

"Opinion," a true and correct copy of which is attached hereto as **Exhibit "A"**). The Opinion

analyzes whether "fantasy sports contests" constitute illegal "gambling" under Tennessee law.

The Opinion defines "fantasy sports contests as follows:

> "Fantasy sports contests are contests in which participants choose
> current athletes in a given professional or college sport to create a virtual
> sports team and then compete against other fantasy sports participants.
> The contests may take place over a variety of time periods ranging from
> one day to an entire season. The winners of the contests are determined on
> how the participants' chosen athletes individually perform in their actual
> professional or college sporting events.
>
> The contests are generally offered by fantasy sports leagues via
> electronic device. Participants create accounts with the fantasy sports
> leagues and pay an entry fee to participate in one or more of a league's
> fantasy sports contests. The participants then select their respective teams
> of athletes in a certain sport, often under an imaginary salary limit or
> budget. Participants earn points based on the statistical performance of the
> athletes in the actual sporting events. Depending on the athletes' overall
> performances, a participant may win a share of a cash prize. Participants'
> entry fees help fund the prize, and a portion of these fees is paid to the
> fantasy sports league."

(Opinion at p. 1)

24.     First, the Opinion points out that "gambling" was, at the relevant time period,

illegal in Tennessee, and that it was a criminal offense under TENN. CODE ANN. § 39-17-503 for

anyone to knowingly induce another to engage in gambling and intends to derive or derives an

economic benefit other than personal winnings from the gambling.   Second, the Opinion found

that the definition of "gambling" – "risking anything of value for a profit whose return is to any

degree contingent on chance..." – is very broad in Tennessee, noting that the Sentencing

8

Commission Comments provide that the definition includes "any scheme by which value is risked upon a chance for greater value as a 'gambling' offense." (*Id*. at p. 2).

25.    Lastly, the Opinion concludes that fantasy sports contests constituted illegal gambling:

> "Fantasy sports contests fall within the broad definition of "gambling" under Tennessee Code Annotated § 39-17-501(1). The participants pay an entry fee in order to win a prize. A portion of the fees comprise the pot of funds that are paid out to the winning participants. By proffering these entry fees, participants agree to risk something of value for a profit – a portion of the pot. Hence, the only remaining consideration is whether a participant's ability to win a fantasy sports contest is to "any degree contingent on chance." While participants may use skill to select players for their teams, winning a fantasy sports contest is contingent to some degree on chance. Namely, the participants do not control how selected athletes perform in actuality on a given day. Athletes' performances are affected by many fortuitous factors – weather, facilities, referees, injuries, etc."

(*Id*. at p. 2).

**C.    The Gaming Contests Created, Promoted and Operated by FanDuel Also Clearly Constituted an Illegal Lottery during the relevant time period.**

26.    Based upon the facts alleged herein, FanDuel also promoted, operated and managed an illegal lottery in violation of Tennessee's Constitution and Tennessee statutory law at the times relevant to this Amended Complaint.

27.    The Tennessee Constitution explicitly prohibits lotteries in Tennessee, except those state run lotteries that provided their net funds to Tennessee citizens for college and other educational tuition assistance. *See* Tennessee Constitution, Art. XI, Sec. 5.

28.    Pursuant to TENN. CODE ANN. § 39-17-501(5), a "lottery" means "the selling of anything of value for chances on a prize or stake." The three elements of a lottery are: consideration, prize and chance. As alleged above, all three elements were present with respect to FanDuel's gaming. First, Plaintiff's spouse and all bettors pay money to FanDuel for the

ability to participate in the gaming contests. Second, Plaintiff's spouse and all bettors are offered a monetary prize which, if won, would greatly exceed the amount wagered and paid to FanDuel.

29.     Lastly, there clearly is an element of chance with respect to FanDuel' gaming website.  Once again, Tennessee Attorney Generals and Tennessee law held that it is the particular character of the game -- and not the skill or lack of skill of an individual participant that determines whether the game at issue is one of chance or skill.  *See*, Op. Tenn. Att'y. Gen. No. 05-159 (Legality of Texas Hold'em Poker Tournaments with Jackpot Price, Oct. 14, 2005)(ruling that poker tournaments charging an admission fee to play "Texas Hold'Em" for a chance to win a prize constituted a "lottery" as defined under TENN. CODE ANN. § 39-17-501(5) despite the alleged skill involved in playing live poker); Op. Tenn. Att'y. Gen. Opinion No. 94-127 (Video Poker Machines as Lotteries, Nov. 1, 1994)(holding that video poker, although it involves skill, is a game of chance and hence a lottery).

30.     As alleged above, FanDuel's bettors can acquire and exercise the all the knowledge in the world as to which actual athlete and team may a better performer over other athletes and teams but this skill (while it may increase the odds of winning -- though studies show that it does not) ultimately does not determine the outcome -- instead, it is only the actual athlete and sporting team that have any semblance of control of the actual outcome, and even these actual sporting participants are subject to chance.  FanDuel's gambling scheme clearly involved a significant degree of chance because an individual athlete's performance will always be affected by material elements of chance that affect scoring and winning outcomes including variables such as player injury, player error, weather conditions, controversial officiating, suspension, or other off field circumstances and other conditions well beyond the control of the actual athlete or team.  FanDuel's bettors have no measure of control over all of the variables that affect the performance of the college and professional athletes that they select, and, thus, FanDuel

had, under the law at the time relevant to this Amended Complaint, in addition to engaging in gambling, promoted and conducted an illegal lottery in Tennessee.

**D.**     **Plaintiff Never Became a Registered User of FanDuel.com and, Thus, FanDuel's Purported Contractual Terms Concerning Arbitration Are Irrelevant to this Complaint.**

31.     TENN. CODE ANN. § 29-19-101 provides:

> "All contracts founded, in whole or in part, on a gambling or wagering consideration, shall be void to the extent of such consideration."

*See*, TENN. CODE ANN. § 29-19-101.

32.     Additionally, TENN. CODE ANN. § 39-17-501(1) provides that "Gambling is contrary to the public policy of this State ..." Under Tennessee law, then, "when a contract is void, the law treats it as if it never came into existence." *Isbell v. Hatchett*, 2015 Tenn. App. LEXIS 81, *20-22 (Tenn. Ct. App. Feb. 23, 2015).

33.     FanDuel's website contains a "Terms of Use" section which FanDuel employs to purportedly bind its customers before they are permitted to utilize and bet on its website. As a result, this provision is part and parcel of the gambling and illegal lottery contracts entered into by the gamblers (*i.e.* players) on FanDuel.com. Because the Terms of Use constitutes a contract founded in whole or in part, on gambling or wagering, prior to July 2016, all of FanDuel's purported contractual provisions, including those calling for binding arbitration, would appear to have been void, against public policy and of no effect.

34.     The legality and enforceability of the Terms of Use contained on FanDuel.com, however, are of no moment to this action and not at issue in this action. Plaintiff never became a registered customer of FanDuel.com and never used Defendant's gambling website or services. Further, Plaintiff makes no claim to enforce any of the provisions of the Terms of Use (or any

11

other alleged contract with Defendant) nor does she allege that she is entitled to any benefits flowing from any contractual term allegedly entered into with Defendant. Moreover, the Terms of Use expressly state that there shall be no third-party beneficiaries to its Terms; thus, FanDuel cannot claim that Plaintiff is somehow bound to the Terms of Use under any contractual third-party beneficiary legal theory. As a result, FanDuel's Terms of Use and/or any other alleged contracts with its betting customers are irrelevant to this Complaint.

E.     **FanDuel's Promotion and Operation of Gambling and Unlawful Lottery Activity in Tennessee Causes Plaintiff's Spouse to Lose $545,119.22.**

35.     Through Defendant's advertising and promotion of its gambling website www.FanDuel.com in Tennessee, Plaintiff 's former spouse, Kenneth Miller, learned of and began to gamble on said website in Tennessee. At all times relevant to this Complaint, Kenneth Miller was a resident of Tennessee and conducted all gambling activities with FanDuel in Tennessee.

36.     Regrettably, Plaintiff's former spouse developed an addiction to gambling on FanDuel.com. Between April 7, 2015 through February 16, 2016, Plaintiff's former spouse, while in Tennessee, delivered $1,521,379.00 to FanDuel for the purpose of betting on FanDuel.com. During this same time period, Plaintiff's former spouse withdrew $976,259.78 from his account at FanDuel. As a result, from April 7, 2015 through February 16, 2016, Plaintiff's former spouse lost the net amount of $545,119.22 upon games, wagers and/or lottery contests promoted and operated by FanDuel. (Plaintiff's spouse made no further bets with Defendant after February 16, 2015). The total net loss incurred by Plaintiff's spouse during this time period is exactly $545,119.22. Under Tennessee law, only net losses may be recovered by Plaintiff. *See*, *Dunn v. Bell*, 85 Tenn. 581, 4. S.W. 41 (Tenn. 1886). It is believed that some portion of the net loss may consist of funds that were embezzled by Plaintiff's former spouse

12

from First Tennessee Bank, although Plaintiff is still attempting to determine how much, if any, of the loss derived from embezzled funds and how much derived from lawfully-obtained funds.

37.    Defendant's then-unlawful activities in Tennessee have directly and proximately caused Plaintiff's spouse to lose $545,119.22 in gambling and illegal lottery contests, less any amounts that Mr. Miller unlawfully embezzled from First Tennessee Bank and co-mingled with lawfully-obtained funds, an amount that Plaintiff is seeking to determine. This financial loss has been difficult to bear for Plaintiff. As a result, Plaintiff has brought this action against Defendant, for the use and benefit of herself, or alternatively, her and Mr. Miller's minor child, Kinison Miller, to recover the net losses of the lawfully-obtained funds in an amount to be determined.

## V.

## CAUSES OF ACTION

### COUNT I – VIOLATION OF TENN. CODE ANN. § 29-19-105 - UNLAWFUL GAMBLING OR WAGERING PROMOTION, MANAGEMENT AND OPERATION

38.    Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

39.    TENN. CODE ANN. § 29-19-104 provides:

> "Any person who has paid any money, or delivered anything of value, lost upon any game or wager, may recover such money, thing, or its value, by action commenced within ninety (90) days from the time of such payment or delivery."

40.    TENN. CODE ANN. § 29-19-105 provides:

> "Any other person may, after the expiration of the ninety (90) days, and within twelve (12) months thereafter, recover the amount of such money, thing, or its value, by action for the use of the spouse; or, if no spouse, the child or children; and, if no child or children, the next of kin of the loser."

41.    Plaintiff Erica Miller's former spouse, Kenneth Miller, delivered money to FanDuel which was lost upon a game or wager, during the time period of April 7, 2015 through

13

February 16, 2016. Pursuant to TENN. CODE ANN. § 29-19-105, Plaintiff has the right to bring this action for the use or benefit of herself (or alternatively, her and her former spouse's minor child) because, as alleged above, at all relevant times, FanDuel's activities in Tennessee constituted "gambling" as defined under TENN. CODE ANN. § 39-17-501(1), which was against public policy and unlawful. Because FanDuel maintained and operated these gambling contests, it is liable to Plaintiff for the net losses as a gambling operator. *See*, *Pickard v. Berryman*, 142 S.W.2d 764 (Tenn. Ct. App. 1939)(ruling that evidence showing defendant controlled or operated gambling room was sufficient to hold defendant liable for gambling losses incurred by minor's father in games conducted by others). The net amount of Plaintiff's losses and the total monetary amount she seeks from Defendant, exclusive of interest and costs, is $545,119.22, less any amounts that Mr. Miller unlawfully embezzled from First Tennessee Bank and co-mingled with lawfully-obtained funds, an amount that Plaintiff is seeking to determine.

### COUNT II – VIOLATION OF TENN. CODE ANN. § 29-19-105 - UNLAWFUL PROMOTION, MANAGEMENT AND OPERATION OF AN ILLEGAL LOTTERY

42. Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

43. As alleged above, at all relevant times, FanDuel's gaming and operations constituted a lottery under TENN. CODE ANN. § 39-17-501(5), which defines a "lottery" as "the selling of anything of value for chances on a prize or stake."

44. Article XI, Section 5 of Tennessee's Constitution expressly forbids lotteries unless they are "state" run and authorized lotteries for educational purposes. As a result, the Tennessee Constitution expressly barred the lotteries that were created, managed and conducted by FanDuel.

45. Lotteries were a form of gambling as set forth in TENN. CODE ANN. § 39-17-501.

Further, lotteries constituted "any game or wager" as set forth in TENN. CODE ANN. § 29-10-104.

46.     Plaintiff Erica Miller's former spouse, Kenneth Miller, delivered money to FanDuel which was lost upon a game or wager, during the time period of April 7, 2015 through February 25, 2016.  Pursuant to TENN. CODE ANN. § 29-19-105, Plaintiff has the right to bring this action  for the use or benefit of herself (or alternatively, her and Mr. Miller's minor child) because, as alleged above, FanDuel's gaming contest in Tennessee constituted illegal "lotteries" as defined under TENN. CODE ANN. § 39-17-501(5), which were against public policy and unlawful under Tennessee law.   Because FanDuel maintained and operated these illegal lotteries, it is liable to Plaintiff for the net losses as an illegal lottery operator. *See*, *Pickard v. Berryman*, 142 S.W.2d 764 (Tenn. Ct. App. 1939)(ruling that evidence showing defendant controlled or operated gambling room was sufficient to hold defendant liable for gambling losses incurred by minor's father in games conducted by others).  The net amount of Plaintiff's losses and the total monetary amount she seeks from Defendant, exclusive of interest and costs, is $545,119.22, less any amounts that Mr. Miller unlawfully embezzled from First Tennessee Bank and co-mingled with lawfully-obtained funds, an amount that Plaintiff is seeking to determine.

## COUNT III – PUNITIVE DAMAGES

47.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth fully herein.

48.     Defendant acted intentionally and/or recklessly with respect to their wrongful conduct because they were aware, but consciously disregarded, the substantial and unjustifiable harm that they would cause to Plaintiff  by promoting and operating gambling and/or lotteries in Tennessee to Plaintiff's spouse and other Tennesseans. As alleged above, at all relevant times to this Amended Complaint and prior to July 2016, gambling and lotteries were not only illegal in

15

Tennessee, they were also criminal activities.

49.     Defendant recklessly continued to promote its then-illegal gambling scheme in Tennessee even when a plaintiff in Tennessee sued Defendant, making the virtually identical claims as set forth herein. Defendant's conduct became clearly intentional when it continued to promote and operate its then-illegal gambling scheme in Tennessee after Tennessee's Attorney General issued his April 5, 2016 Opinion alleged in detail above.

50.     As a result, Defendant's actions and omissions constituted a reckless and/or gross deviation from the standard of care that an ordinary person would exercise under the circumstances.

51.     Because of Defendant's wrongful conduct, punitive damages are warranted in order to punish Defendant and to deter it from future misconduct.

52.     With respect to the applicable factors that may be addressed by the fact finder when determining punitive damages, Plaintiff would allege as follows:

(i)     Defendant's financial affairs, financial condition and net worth range in the multimillions of dollars;

(ii)     The nature and reprehensibility of Defendant's wrongdoing is substantial because Defendant have intentionally or recklessly abused and taken advantage of a Plaintiff, who housewife and is in financial straits due to this misconduct;

(iii)     Defendant was aware of the harm that could and would be caused to Plaintiff with respect to its wrongful conduct;

(iv)     Defendant's misconduct spanned several years;

16

(v)     In order to recover their losses, Plaintiff will incur substantial costs;

(vi)     Defendant profited significantly from the unlawful gambling fees, and a significant punitive award is the only method to deter future similar misconduct.

## VII.

## PRAYER FOR RELIEF

WHEREFORE, the named Plaintiff Erica Miller, for the use and benefit of herself or, alternatively, for her and Mr. Miller's minor child, Kinison Miller, demand a Judgment against Defendant FanDuel, Inc. on each Count of the Complaint and the following relief:

1.     Issue service of process and serve the Defendant;

2.     Empanel a jury to try this matter for all issues so triable;

3.     Grant any reasonable request to Amend Plaintiff's Complaint to conform to the discovery and evidence obtained in this action;

4.     Find that Defendant has violated TENN. CODE ANN. § 29-19-105 and award Plaintiff compensatory damages, exclusive of interest and cost, in the total amount of $545,119.22, less any amounts that Mr. Miller unlawfully embezzled from First Tennessee Bank and co-mingled with lawfully-obtained funds, an amount that Plaintiff is seeking to determine;

5.     Award punitive damages to Plaintiff in an amount to be determined by the trier of fact but in an amount not less than twice Plaintiff's actual damages, to be calculated on the determination of her net loss of lawfully-obtained funds;

17

6.      Award pre-and post-judgment interest in the amount of 10% per annum pursuant

to TENN. CODE ANN. § 47-14-123 in amount according to the proof at trial;

7.      Award costs and expenses incurred in this action pursuant to Rule 54 of the

Tennessee Rules of Civil Procedure;

8.      Grant the Plaintiff such further relief as the Court may deem just

and proper.

Respectfully submitted,

*/s Frank L. Watson, III*
Frank L. Watson, III (Tenn. Bar No. 15073)
William F. Burns (Tenn. Bar No. 17908)
WATSON BURNS, PLLC
2500 S. Houston Levee Road
Germantown, Tennessee 38139
Phone: (901) 529-7996
Fax: (901) 529-7998
Email: fwaston@watsonburns.com
Email: bburns@watsonburns.com
www.watsonburns.com

*Counsel for Plaintiff Erica Miller, for the use and
benefit of herself or, alternatively, her and Kenneth
Miller's minor child, Kinison Miller*

18

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all parties at interest in this cause by electronic filing.

This the 10th day of October 2023.

*/s Frank L. Watson, III*
Frank L. Watson, III